```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/14/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
:
(RC) 2 PHARMA CONNECT, LLC,                            :
:
                          Plaintiff,             :        21-cv-11096 (LJL)
:
           -v-                                             :        OPINION AND ORDER
:
MISSION PHARMACAL COMPANY,                             :
:
                         Defendant.              :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Mission Pharmacal Company ("Defendant" or "Mission") moves for sanctions pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power against Plaintiff (RC) 2 Pharma Connect, LLC ("Plaintiff" or "(RC) 2"). Dkt. No. 36. Defendant argues that sanctions are appropriate because Plaintiff filed an amended complaint based on allegations it knew to be untrue and then, after Defendant asked Plaintiff to withdraw its complaint, Plaintiff refused to do so, forcing Defendant to make its successful motion to dismiss the action. For the reasons that follow, the motion for sanctions is granted in part and denied in part.[1]

---

[1] Plaintiff's request to file a sur-reply in opposition to the motion for sanctions is denied as its contents would not change the result in this case. Dkt. No. 50. That sur-reply repeats an argument "already present in Defendants' opposition brief." *Convergen Energy LLC v. Brooks*, 2020 WL 4500184, at *3 (S.D.N.Y. Aug. 5, 2020), *reconsideration denied*, 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020); *see Kapiti v. Kelly*, 2008 WL 754686, at *1 n.1 (S.D.N.Y. Mar. 12, 2008) ("Allowing parties to submit surreplies is not a regular practice that courts follow, because such a procedure has the potential for placing a court in the position of refereeing an endless volley of briefs.").

## BACKGROUND

Familiarity with the Court's prior opinion and order dismissing the amended complaint for failure to state a claim for relief is assumed. Dkt. No. 87. The Court states only those facts necessary to resolve the motion for sanctions.

(RC) 2 is a pharmaceutical broker that "specializes in sourcing and developing chemicals, pharmaceutical ingredients, and pharmaceutical products in cooperation with manufacturing partners." Dkt. No. 8 ¶ 1. Mission is a pharmaceutical company that develops and manufactures pharmaceuticals as a contract partner for third parties. *Id.* ¶ 2. In January and March 2019, the parties entered into two agreements relating to the development of docosanol 10% cream, a generic version of a topical medication: a non-disclosure agreement effective January 2019 ("NDA") and a proposal agreement dated March 13, 2019 and re-executed on May 17, 2019 ("Proposal Agreement"). *Id.* ¶¶ 29–32, 47–48. The NDA permitted the parties to share confidential information with each other regarding docosanol 10% cream, Dkt. No. 8-1 § 3(a), (b); the Proposal Agreement required Defendant to perform specified activities to support the development of a formulation and process for the commercial launch of docosanol 10% cream and to assist with the submission of an Abbreviated New Drug Application ("ANDA"), *id.* ¶¶ 47–48; Dkt. No. 8-2. Among the activities Defendant agreed to undertake was stability testing on registration batches of the cream, which would be necessary for the ultimate preparation of the ANDA. Dkt. No. 8-2.

A detailed discussion of the procedural history is necessary to understand the current motion.

On December 28, 2021, Plaintiff filed a complaint initiating this action. Dkt. Nos. 1, 71. The thrust of the complaint was that Defendant had violated the NDA and had either breached or clearly and unequivocally expressed its intent to breach its obligations under the Proposal

Agreement between the parties. Dkt. Nos. 1, 71. The claim that Defendant had breached the NDA was based on the allegation that a request by Defendant's in-house counsel in the summer of 2021 that the parties enter into a Technology Transfer Agreement ("TTA") "has caused [Defendant] to intentionally breach the NDA." Dkt. No. 71 ¶ 78. Plaintiff inferred that because Defendant would not agree to give Plaintiff an exclusive license to Defendant's technology developed in connection with the project that Defendant intended to use Plaintiff's confidential information outside of the scope of permitted uses under the NDA. *Id.* ¶¶ 70, 73, 115.

The claim regarding the breach or anticipatory breach of the Proposal Agreement was founded on two related sets of allegations. First, Plaintiff claimed that communications from Defendant had given it reason to believe that Defendant would not fulfill its obligation to collect and perform six-month stability testing on three registration batches of Plaintiff's docosanol 10% cream on the timetable set forth in the Proposal Agreement, which included the collection of the first batch by December 21, 2021. *Id.* ¶¶ 82–89, 107–113. That allegation was the centerpiece of the complaint. Plaintiff alleged that the stability testing was "agreed-to" and "time-critical," *id.* at 14, and that Defendant's recent communications had given Plaintiff "reason to believe that [Defendant] ha[d] not done what is necessary to perform the six-month stability testing as required by the FDA," *id.* ¶ 87. Plaintiff alleged that "[i]f the requisite six-month stability testing is not initiated by December 31, 2021, (RC) 2 will be irreparably harmed by, *inter alia*, being forced to restart the entire ANDA process including, but not limited to, identifying a suitable and trustworthy partner, developing an acceptable protocol, and restarting the required manufacture and testing processes." *Id.* ¶ 88. The complaint asserted that "[u]nless Mission performs the Six-Month Stability Pull for 39X21 before December 31, 2021, (RC) 2 will be completely unable to complete the development of the docosanol 10% cream and ANDA submission pursuant to the

3

Proposal Agreement" and that "(RC) 2 would be required to restart the entire development process, the completion of which will take approximately a year." *Id.* ¶ 132. Second, Plaintiff complained that if Defendant did not collect and provide to third parties certain materials that were exclusively in its possession, including registration batches, samples of the six-month stability pulls, and placebo samples, it would not be able to arrange for certain third-party studies Defendant was required to obtain. *Id.* ¶ 93. Thus, Plaintiff alleged "[i]f Mission fails to timely collect the Six-Month Stability Pulls, then the Third-Party Studies will not be timely performed and Mission's conduct will have irreparably destroyed the entire ANDA submission process pursuant to the Proposal Agreement." *Id.* ¶ 94.

Plaintiff asserted two claims: (1) breach of the parties' NDA and/or intention to breach the NDA; and (2) breach of the Proposal Agreement based on Mission's "failure to confirm" that it had performed certain batch pulls as part of the stability testing of the Product. Plaintiff alleged that the failure of Defendant to gather the first six-month stability pull and commence the stability tests by December 31, 2021, and the failure to gather the second two six-month stability pulls by January 31, 2022 and to initiate the six-month stability tests for them would cause it irreparable harm. *Id.* ¶¶ 101–103.

That same day, after receiving the complaint, Mission's counsel reached out to Plaintiff's counsel by telephone. Dkt. No. 20-2 ¶ 3. Through counsel, Defendant confirmed that it had already collected the samples that comprised the first batch one week earlier (on December 21, 2021), that it was conducting stability testing of those samples, and that it would ensure that future samples of the first batch as well as other batches of the product would be timely collected. *Id.* Plaintiff responded later that same day through counsel that it would forego pursuing its threatened application for a temporary restraining order if Mission's counsel could

4

"confirm in writing to me that Mission initiated the stability pull of [the first batch] on December 21, 2021 and is in the process of performing the stability testing of the same batch for timely completion." Dkt. Nos. 8-6, 20-2 ¶ 6. The following day, December 29, 2021, Defendant, through counsel and in an email marked "Settlement Communication," provided the following written confirmation to counsel for Plaintiff: "Mission has confirmed to me that it initiated the 6-month stability pull of Batch 1 (lot 39x21) on December 21, 2021 and Mission is in the process of performing the stability testing of such Batch." Dkt. No. 8-6. The email also stated: "Mission plans to pull the 6-month samples for Batches 2 and 3 (lots 40x21 and 41x21) on January 12, 2022." *Id.* Counsel for defendant also stated that it preferred Plaintiff take possession of the samples and perform stability testing with a third party but that if this could not be done, Defendant might be willing to perform the stability testing as long as it could be assured payment for doing so. *Id.*

On the night of December 29, 2021, Plaintiff filed an amended complaint ("Amended Complaint"). Dkt. No. 8. The Amended Complaint made only slight changes to the original complaint. It still alleged that based on counsel's "statements that Mission will not grant an exclusive license to technology related to developing docosanol 10% cream, Mission has breached" the NDA or that its statements "constitute a threat that Mission will breach the NDA by using (RC) 2's Confidential Information to (RC) 2's detriment." *Id.* ¶¶ 130, 133. It alleged that Mission's failure to respond in substance to communications from (RC) 2 dated December 16, 2021, December 17, 2021, and December 21, 2021 as well as "recent correspondence to the contrary" "confirmed" that Defendant was in breach of the Proposal Agreement and that unless Mission performed the six-month stability pull for the first registration batch before December 31, 2021, RC (2) would be unable to complete the development of the cream and the ANDA

submission pursuant to the Proposal Agreement. *Id.* ¶¶ 144–146. The Amended Complaint added a third count for anticipatory breach of contract. That claim was based on communications from Defendant's in-house counsel in September 2021, asking Plaintiff to sign the TTA. *Id.* ¶ 153. It also was based on the communication from Defendant's outside counsel on December 29, 2021, which Plaintiff characterizes to the effect that Mission was refusing to perform "any future work of any type." *Id.* ¶ 154.[2] The Amended Complaint otherwise gave a nod to the communications from counsel earlier that same day—acknowledging that Defendant's "communications suggest that it has timely initiated the six-month stability testing," but then asserted without any foundation "it is not clear whether Mission will complete the six-month stability testing [for the first batch]," *id.* ¶ 96, and it repeated that recent communications had given Plaintiff "reason to believe that [Defendant] ha[d] not done what is necessary to perform the six-month stability testing as required by the FDA," *id.* ¶ 94, and that "[i]f the requisite six-month stability testing is not initiated by December 31, 2021, (RC) 2 will be irreparably harmed by, *inter alia*, being forced to restart the entire ANDA process including, but not limited to, identifying a suitable and trustworthy partner, developing an acceptable protocol, and restarting the required manufacture and testing process," *id.* ¶ 95.

On December 30, 2021, Plaintiff filed an emergency application for a temporary restraining order. Dkt. No. 9. That same morning, counsel for Defendant spoke by telephone with counsel for Plaintiff and asked why the motion had been filed despite Mission's written

---

[2] The email from counsel references that, as Plaintiff was aware, Defendant does not do certain types of testing and that Plaintiff would have to find a third-party vendor to perform the activities. Dkt. No. 8-6. In the course of the email, Defendant's outside counsel states: "RC2 will need to use third-parties other than Mission for any other activities that were previously being performed by Mission, including but not limited to (i) any future work of any type, (ii) any development work or validating testing for an IVTR method, (iii) all testing and analyses on Abreva samples." *Id.*

6

assurances. Dkt. No. 20-2 ¶ 11. Mission's counsel offered to provide a sworn affidavit from Mission confirming that all testing was being done under the Proposal Agreement. *Id.* ¶ 12. Mission's counsel also wrote via email to (RC) 2's counsel stating: "As I have advised several times, Mission has done, and is doing, the stability testing for Batches 1, 2, and 3 and there is no basis for the emergency motion." *Id.* ¶ 16. Plaintiff's counsel refused to withdraw its application for injunctive relief, *id.* ¶ 18, and Mission was forced to file its opposition, including with the declaration from Mission confirming that it planned to comply with its obligations in the Proposal Agreement, Dkt. Nos. 20, 20-2. On January 3, 2021, (RC) 2 agreed to withdraw its emergency motion.

On February 18, 2022, Defendant filed its motion to dismiss the Amended Complaint and an accompanying memorandum of law. Dkt. Nos. 34–35. On February 25, 2022, Defendant also brought the instant motion for sanctions. Dkt. Nos. 36–37. Plaintiff filed memoranda of law in opposition to both motions on March 11, 2022. Dkt. Nos. 42–43. On March 25, 2022, Defendant filed reply memoranda of law in support of both motions. Dkt. Nos. 47–48. At argument on the motion to dismiss, Plaintiff stated that it was not pursuing its anticipatory breach claim. Dkt. No. 92 at 21:6–10. On July 5, 2022, the Court granted the motion to dismiss. Dkt. No. 87. In doing so, it concluded that Plaintiff's allegations of a breach of the NDA were based on speculation, *id.* at 16, and that the complaint did not allege that Defendant had failed to perform any stability testing it had an obligation to perform, *id.* at 18. The Court also dismissed the anticipatory breach claim as abandoned. *Id.* at 23.

## DISCUSSION

Defendant moves for sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power.

I.       Rule 11

Federal Rule of Civil Procedure 11(b) provides that an attorney's presentation to a court of a pleading constitutes a certification "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the pleading "is not being presented for any improper purpose," "the claims . . . and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b).  The 1993 Advisory Committee Notes explains that Rule 11(b) "expands the responsibilities of litigants to the court," including by "emphasiz[ing] the duty of candor."  Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.  The Supreme Court has stated that "the central purpose of Rule 11 is to deter baseless filings in district court" and thus "streamline the administration and procedure of the federal courts."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

As a general matter, "Rule 11 does not impose a continuing obligation on the presenter to update, correct or withdraw any pleading, written motion or other paper which, when presented, satisfies the requirements of the Rule."  *Fuerst v. Fuerst,* 832 F. Supp. 2d 210, 219 (E.D.N.Y. 2011) (quoting *Carlton Group, Ltd. v. Tobin,* 2003 WL 21782650, at *6 (S.D.N.Y. July 31, 2003)).  However, "Rule 11 is nevertheless implicated 'where an attorney or party declines to withdraw a claim upon an express request by his or her adversary after learning that [the claim] was groundless.'"  *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 597 (S.D.N.Y. 2013) (quoting *Fuerst*, 832 F. Supp. 2d at 220 (alteration in original)).

Defendant's request for Rule 11 sanctions is well-founded here.  Plaintiff filed the Amended Complaint without any basis for the claim regarding the breach of the NDA.  That

8

claim was based on rank speculation that because Defendant was not willing to grant Plaintiff an exclusive license to use Defendant's own technology, Plaintiff had reason to believe that Defendant intended to manufacture and supply or to act as a distributor and sell docosanol 10% cream to third parties other than Plaintiff.  Dkt. No. 8 ¶¶ 128–131.  Plaintiff claimed that Defendant was in breach of its obligations under the NDA or had clearly and unequivocally indicated it would breach the NDA.  *Id.*  However, as the Court explained in its opinion on Defendant's motion to dismiss the Amended Complaint, Dkt. No. 87, there are many reasons why Mission would not want to license its technology "exclusively to (RC) 2 short of a plan to sell (RC) 2's docosanol 10% cream or to misuse (RC) 2's trade secrets," *id.* at 16.  For example, Defendant is a contract partner for third parties in the development and manufacture of pharmaceuticals, including but not limited to (RC) 2, and therefore may not have wanted to give Plaintiff a veto over what Defendant chose to do with its technology.  The lack of an exclusive license could have also allowed Defendant to retain some bargaining power in its future negotiations with (RC) 2.  *Id.* at 17.  And, if (RC) 2 had wanted or needed this exclusive commitment, it could have required it in advance; however, there is no allegation that it did so.  Thus, Defendant's failure to agree to an exclusive license does not alone suggest that Mission was in breach of any agreement of the parties or was using RC (2)'s confidential information in a way that violated the NDA.

In addition, Mission's refusal to enter into the exclusive license agreement did not constitute an anticipatory breach of the contract.  A party's repudiation of a contract must be "positive and unequivocal."  *See In re Best Payphones, Inc.*, 432 B.R. 46, 54 (S.D.N.Y. 2010) (citation omitted), *aff'd*, 450 F. App'x 8 (2d Cir. 2011).  In other words, "there must be among other things some express and absolute refusal to perform, or some voluntary act on the part of

the individual which renders it impossible for him or her to perform." *CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, 2018 WL 2081860, at *8 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). Here, for the reasons discussed, there was no such thing.

Plaintiff also had no evidentiary support for the claim that Defendant had failed to initiate or would fail to complete stability testing for the first batch or that it would not engage in future stability testing in violation of the Proposal Agreement. The heart of (RC) 2's complaint with regard to this claim was that Defendant failed to respond to its request that by December 22, 2021 it confirm that it would be complying with its obligations under the Proposal Agreement. Dkt. No. 8 ¶ 145. As explained in the Court's prior opinion and order, Defendant had no obligation to answer by December 22, 2021: "There is no requirement under the Proposal Agreement, however, that Mission respond to a unilateral demand from (RC) 2 within a specified time period on pain that if it does not do so it will be considered in default of the agreement." Dkt. No. 87 at 21–22. By demanding an answer and then setting the arbitrary deadline of December 22, Plaintiff manufactured its own basis for a lawsuit without any evidentiary foundation that such lawsuit had merit.

Moreover, by the time Plaintiff filed its Amended Complaint, it knew that Defendant was complying with its contractual obligations under the Proposal Agreement. Defendant had written to Plaintiff, as Plaintiff requested, that "Mission . . . initiated the 6-month stability pull of Batch 1 . . . on December 21, 2021," precisely as contractually required, "and Mission is in the process of performing the stability testing of such Batch." Dkt. No. 8-6 at ECF p. 2. It also had written, as requested by Plaintiff, that "Mission plans to pull the 6-month samples for Batches 2 and 3 . . . on January 12, 2022." *Id.* Although Defendant had indicated a preference that Plaintiff have a third party—and not Defendant—conduct the stability testing for those batches

(an understandable sentiment since Defendant had just been sued by Plaintiff without foundation), it also indicated a willingness to do that stability work. *Id.* There thus was no basis for the claim that Mission's communications indicated that it was in breach of the Proposal Agreement. Dkt. No. 8 ¶¶ 144–146. The recent communications, in fact, indicated the opposite.

Finally, there was no basis for Plaintiff's claim of anticipatory breach of contract when it was made in the Amended Complaint. That claim had two purported foundations before it was abandoned—the statements of the general counsel in the period from the summer of 2021 to September 2021 suggesting that Mission would need a TTA to continue work on the project and Mission's outside counsel's email on December 29, 2021. *Id.* ¶ 154. But the communications from the summer to September 2021 could not be a basis for a claim of anticipatory breach. After those communications, Defendant continued to perform on the contract as Plaintiff well knew at the time of the Amended Complaint. *See* Restatement (Second) of Contracts § 256 (1981) (noting that repudiation of contract may be nullified by subsequent conduct of repudiating party where injured party is aware of such conduct and has not materially changed its position in reliance on the repudiation); *see also Mindel v. Image Point Prods., Inc.*, 725 F. Supp. 189, 194 & n.6 (S.D.N.Y. 1989). As to the more recent communications in December 2021, there are two reasons why those communications would not provide support for the claim of anticipatory repudiation. First, under Federal Rule of Evidence 408, the email communication itself cannot serve as evidence of the validity of the claim of anticipatory breach, Fed. R. Evid. 408; Plaintiff would need some evidence apart from the settlement communication. Second, the email read in its entirety does not support the claim that Defendant clearly and unequivocally is refusing to perform its duties under the Proposal Agreement. Dkt. No. 8-6. The email is from counsel, in response to a lawsuit from Plaintiff which sought, among other things, an order that Defendant

gather the stability pulls and perform the stability tests and either arrange for the third-party studies and provide third-party laboratories all necessary materials for them to timely perform the third-party studies or, in the alternative, an order requiring Defendant "to provide (RC) 2 or any third-party lab identified by (RC) 2 all necessary materials for any third-party lab identified by (RC) 2 to perform the Third-Party Studies." Dkt. No. 1 at 24–25. Plaintiff had indicated it was concerned about the stability pulls and the stability testing. In that context, it could hardly constitute an anticipatory breach for Defendant's counsel to respond to the lawsuit with a settlement proposal that contemplated a "hope that we resolve issues and terminate the parties' relationship before there is a need to address the lawsuit" and offered to engage in a dialogue "to facilitate an efficient and quick termination of the parties' business relationship," particularly when at the same time counsel was expressing Defendant's commitment to ensuring the completion of the stability testing. Dkt. No. 8-6.

      Plaintiff's responses are unconvincing. It argues that Defendant's conduct beginning in the summer of 2021 and continuing until the unanswered request for confirmation by December 22, 2021 gave it concern that Defendant would not abide by its contractual obligations and that time was then of the essence. Dkt. No. 43. But that argument does not answer the question whether—by December 29, 2021 at the time of the filing of the Amended Complaint—Plaintiff had a good faith belief that its contentions of breach of contract had an evidentiary basis. It did not. Nor does Plaintiff argue that there was a time urgency on December 29, 2021 to filing an Amended Complaint such that it could not reasonably have been expected to engage in further investigation. It also argues that Mission's counsel's communications between December 28 to December 31 were not sufficient to address Plaintiff's concerns. It claims that the communications confirmed "that the testing had begun, but stopped short of confirming, as

requested, that Mission planned to complete the testing." *Id.* at 5.  But the communications contained the unequivocal confirmation that Mission would complete the testing for Batch 1 and that it might be willing to complete the testing for Batches 2 and 3 if Plaintiff—who had then sued Defendant—did not provide another vendor to do so.  In any event, the argument gets the burden backwards—it was Plaintiff's obligation to have evidence or a basis to believe there was evidence—that Defendant would not perform.  It is not sufficient for any contract party to simply say that it is not certain that its counterparty will perform and then to sue solely on that basis.  Courts exist to resolve disputes; they are not intended to serve as vehicles for a party, who has been told that its counterparty is satisfying its contractual obligations and who has no reason to believe otherwise, to ask for further assurance that its rights will be respected.  Next, Plaintiff argues that it has evidence of additional breaches by Defendant of the Proposal Agreement: specifically, Defendant has not been willing to allow its project team to communicate directly with Plaintiff and it has refused to perform in-scope IVRT testing.  *Id.* at 8, 13–14, 23.  But none of those allegations are in the Amended Complaint.  None of them therefore excuse Plaintiff's inclusion of claims in the Amended Complaint for which it provided no evidentiary basis or had no reason to believe that there would be an evidentiary basis and then, when confronted with the fact that there was no basis for the Amended Complaint, to refuse to withdraw it.

**II.     Section 1927 and the Court's Inherent Power**

Defendant also argues that sanctions against (RC) 2 are appropriate pursuant to 28 U.S.C. § 1927 and the Court's inherent power.  Unlike Rule 11 which permits an award of sanctions "on any attorney, law firm, or party that violated the rule or is responsible for the violation," Fed. R. Civ. P. 11(c)(1), Section 1927 permits an award only against an attorney.  It provides: "Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court

to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

"Bad faith is the touchstone of an award under this statute." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991). Accordingly, the Second Circuit has held that "an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.* (citation omitted); *see Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986) ("Imposition of a sanction under § 1927 requires a 'clear showing of bad faith.'" (citation omitted)); *Colucci v. New York Times Co.*, 533 F. Supp. 1011, 1014 (S.D.N.Y. 1982) ("To justify the imposition of excess costs of litigation upon an attorney [under § 1927] his conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation. The section is directed against attorneys who willfully abuse judicial processes."). "Courts within the Second Circuit 'construe [Section 1927] narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law.'" *Cameau v. Nat'l Recovery Agency, Inc.*, 2018 WL 4522104, at *5 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, 2018 WL 4853050 (E.D.N.Y. Sept. 28, 2018) (quoting *Romeo v. Sherry,* 308 F. Supp. 2d 128, 148 (E.D.N.Y. 2004)). "The Second Circuit has interpreted the bad faith standard restrictively, requiring 'clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Goldman v. Barrett*, 2018 WL 11214828, at *9 (S.D.N.Y. Sept. 4, 2018) (quoting *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000)).

The Court finds that sanctions are not appropriate under Section 1927. Although the record reflects that counsel's allegations were not made after a reasonable investigation and are not supported by evidence, the evidence does not rise to the level that convinces the Court that the Amended Complaint was brought in bad faith or was motivated by an improper purpose. There is no evidence that Plaintiff was motivated by purposes such as harassment or delay. Rather, there is evidence that Plaintiff was motivated by a desire to ensure that Defendant complied with its contractual obligations. In doing so, it filed a factually unfounded complaint when it could have and should have rested with the assurances of its contractual counterparty—at least until it had evidence that those assurances could not be trusted. It failed to do so and thus must be sanctioned under Rule 11. But the Court cannot say that it so unreasonably and vexatiously multiplied costs so as to give rise to sanctions under Section 1927.

For the same reasons, the Court also denies the request for sanctions under the Court's inherent power. "The Supreme Court [has] cautioned that, because of the 'very potency' of a court's inherent power, this power should be exercised 'with restraint and discretion.'" *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 49 (S.D.N.Y. 1993) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). "To circumscribe the exercise of this power with reasonable limits, the Second Circuit has 'always required a particularized showing of bad faith to justify the use of the court's inherent power.'" *Id.* (quoting *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d at 1345). Because the Court finds that Plaintiff did not act in bad faith, sanctions pursuant to the Court's inherent power are also inappropriate.

### III. Amount of Sanctions under Rule 11

Defendant requests that the Court award Mission its attorneys' fees and costs incurred in defending against the Amended Complaint and such other and further relief as the Court deems appropriate. Rule 11(c)(4) provides that a sanction "must be limited to what suffices to deter

15

repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). It goes on to provide that the court may issue "an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation" "if imposed on motion and warranted for effective deterrence." *Id.* "The typical sanction . . . is the payment of the other side's reasonable attorney's fees which were incurred as a result of the improper filing." *Brosse U.S.A., Inc.*, 149 F.R.D. at 52. "When a court determines that attorneys' fees and costs should be used as sanctions under Rule 11, the award should be based both on the total amount of reasonable attorneys' fees and costs attributable to the sanctioned party's misconduct and the amount needed to serve the deterrent purposes of Rule 11." *Offor v. Mercy Med. Ctr.*, 327 F.R.D. 32, 34 (E.D.N.Y. 2018); *see Brosse U.S.A., Inc.*, 149 F.R.D. at 52.

Here, the Court finds that an award of attorneys' fees and costs incurred by Defendant in defending against the Amended Complaint is necessary to reimburse Mission and to provide effective deterrence. To justify the award of court-ordered attorneys' fees and expenses, however, the party seeking such an award must provide the Court with "contemporaneous time and expense records specifying, for each attorney performing work on a matter, the date, the hours expended, and the nature of the work done." *Brosse U.S.A., Inc.*, 149 F.R.D. at 52; *see Jackson v. Levy*, 2000 WL 124822, at *9 (S.D.N.Y. Feb. 2, 2000). Fees and expenses must be reasonable to serve the sanctioning purpose of the Rule. *Manti's Transp. v. Kenner*, 2015 WL 1915004, at *14 (E.D.N.Y. Apr. 27, 2015)

Here, Mission has not filed any records documenting the attorneys' fees and costs it has incurred in defending itself against the Amended Complaint. Accordingly, Mission is directed to file this documentation by September 28, 2022, (RC) 2 shall have one week to respond, and the

Court thereafter will determine the exact amount of attorneys' fees and costs to award for Plaintiff's Rule 11 violation.

## CONCLUSION

The motion for sanctions is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 36, 50.

SO ORDERED.

Dated: September 14, 2022
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge